Clifford B. KIMBERLY, Plaintiff-Respondent,

v.

R. G. ALDRIDGE, Defendant-Respondent,

and

Paul Berman, Trustee in Bankruptcy of Stanley C. Dugan, Defendant-Appellant.

No. 23444.

Kansas City Court of Appeals.

Missouri.

April 2, 1962.

Frank P. Barker, Frank P. Barker, Jr., Kansas City, for appellant.

Warren S. Earhart, Kansas City, for respondent R. G. Aldridge.

CROSS, Judge.

This is an equity action in the nature of an interpleader. Plaintiff holds funds in escrow as a disinterested stake holder. Both defendants interplead their respective claims to the fund. Defendant Paul Berman, a Trustee in Bankruptcy, appeals from the trial court's judgment awarding the fund to defendant R. G. Aldridge.

The controversy stems from the construction of the Grandview Bank Building, and involves inter-related transactions between the principal contractor, a subcontractor and a sub-subcontractor.

In September, 1958, the Bennett Construction Company entered into the principal contract with the Grandview Bank to construct the building. Bennett then entered into a subcontract with one Stanley C. Dugan, which provided that Dugan would perform the excavation work on the project. In turn, Dugan entered into a sub-subcontract with defendant Aldridge entitled "Equipment Rental Agreement", which obligated Aldridge to furnish dirt moving machinery and operators for the excavation work, and bound Dugan to pay for the use of such machinery and the labor required for its operation on the basis of an hourly rate.

During October, 1958, Aldridge furnished the required machinery and labor and performed and completed the excavation work called for by his contract with Dugan. In so doing he incurred actual cost expense, including labor hire paid out of pocket, in the sum of $5,867.22, but exclusive of wear and depreciation of his machinery. Aldridge completed performance of the contract on October 3, 1958. Under its terms he was entitled to full payment from Dugan on November 15, 1958. On November 20, 1958, Aldridge invoiced Dugan for the payment of $8,217.50—the contract price for all services rendered under the contract, as calculated by its terms and specified rates. Dugan admits that Aldridge fully performed the contract. He testified Aldridge did "every bit" of the work shown on the statement, and that "the prices charged (the total of $8,217.50) are the contract prices". Dugan made no response to the invoice, and has never paid Aldridge.

After Dugan's default Aldridge looked to Bennett for payment. Aldridge took the position that it was then Bennett's direct obligation, arising by contract, to pay for the labor and materials he had furnished. The contract provisions relied upon by Aldridge are contained in the principal contract between Grandview and Bennett—as affirmed and incorporated in Bennett's subcontract with Dugan.

The Grandview-Bennett contract includes several documents going to make up the entire agreement, one of which is a performance bond executed by Bennett as principal and by the Aetna Casualty and Surety Company as his surety. Pertinent provisions of the bond read as follows:

"NOW, THEREFORE, if Principal shall faithfully perform such contract and pay all persons who have furnished

labor or material for use in or about the improvement and shall indemnify and save harmless the Owner from all cost and damage by reason of Principal's default or failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

"All persons who have furnished labor or material for use in or about the improvement shall have a direct right of action under the bond, subject to the Owner's priority".

The subcontract between Bennett and Dugan provides, in part:

"2. The sub-contractor * * * agrees to comply with the general conditions of the contract between the owner and the general contractor * * *

"4. The purchaser (Bennett) agrees to pay the sub-contractor * * * in accordance with terms of his contract with the owner * * *".

Aldridge first demanded payment from Bennett by a letter and statement of account mailed December 23, 1958, followed by a second letter and statement mailed January 14, 1959, which reads in part as follows: "We would appreciate your check for the above rental as soon as possible, otherwise we will have to take other means to collect this money". Testimony on behalf of Aldridge discloses that the "other means" intended by him were to file a mechanic's lien on the property and to file a suit on Bennett's bond. During these negotiations Aldridge's consulting attorney was Mr. Clifford B. Kimberly—nominal plaintiff in this suit. Mr. Kimberly notified both Bennett and the bonding company of "a potential claim under the bond". He made demand upon Aetna for a copy of the bond and notified that company of Aldridge's claim. The attorney had advised Aldridge that he had a right to file a mechanic's lien against "the job". It was then in contemplation that such lien would be filed if payment was not received before the lien filing period expired.

The record does not show that Bennett made any response to Aldridge's letters. However, it is shown by the testimony of W. W. Bennett, President of the Bennett Company, that he "ran into" Aldridge while on an out state business trip and had a discussion with him about the claim. Mr. Bennett testified, "I assured him if he would come to our office, why we would close the matter because we felt obligated to pay him for it". Bennett also stated that he had in mind, in dealing with Aldridge, the fact that Aldridge had a right to file a mechanic's lien; that he and Aldridge's attorney had discussed that subject several times; that as the original prime contractor he was concerned that a mechanic's lien not be filed on the job and that Aldridge be paid; also that he was familiar with the provision of the bond that anyone who furnished labor on the job had a right to sue directly on the bond for payment and that he recognize Aldridge's right to do so.

The time within which Aldridge could file a statutory lien against the property expired March 1, 1959. Approximately two weeks before that date Aldridge went to the Bennett Company's office and there conferred with W. W. Bennett. Dugan was not present. The conference resulted in a settlement of Aldridge's account by an agreement that Aldridge would reduce his claim to $7500.00 and that Bennett would issue the company's check in the amount of $7500.00 as payment of the claim in full. On February 16, 1959, Bennett issued the check in the agreed amount, payable to Aldridge and Dugan, and delivered it to Aldridge.

Aldridge testified that he accepted the check "as payment for the job" and that as a result of receiving the check he refrained from filing a mechanic's lien and from filing a suit on Bennett's bond. W. W. Ben-

nett testified that he intended the check to be in payment to Aldridge for the work he had done and that it was specifically for that purpose; that he was actuated in making the payment by the fact that Aldridge had "the potential lien right and the potential right to sue on the bond"; that "Dugan never did any work on the site that we know of * * *"; that he (Bennett) took over the job from Dugan and caused it to be completed; that there is a balance due Bennett from Dugan; that Bennett is not indebted to Dugan in any amount; that in view of that situation Bennett would not have paid Dugan any money at all, did not intend to pay him, and did not intend the check to include any payment to Dugan.

After receiving the check from Bennett, Aldridge attempted to locate Dugan and secure his endorsement. Failing to do so, Aldridge endorsed the check and deposited it for payment. The bank on which the check was drawn refused payment because it lacked Dugan's signature.

Dugan testified that he would not have endorsed the check because his attorney had advised him not to do so. He stated that he felt Bennett owed him for the job and that any payment from Bennett to him should be prorated among all of his creditors who had done work on the job.

Dugan was adjudged a bankrupt on March 27, 1959, and in due course defendant Berman was elected his trustee. On the date of the adjudication Bennett's check was uncashed and in Aldridge's (or his attorney's) possession. On September 25, 1959, Aldridge, Dugan and Berman as trustee entered into written agreement that the Bennett check in the sum of $7500.00 should be endorsed by Dugan and Aldridge and converted into a cashier's check payable to plaintiff Kimberly as escrow agent, to be disbursed under final order of the court. The conditions of the agreement were satisfied and plaintiff now holds and impleads the funds.

The trial court generally found the issues in favor of defendant Aldridge and against defendant Berman, trustee, and entered judgment that defendant Aldridge recover the fund of $7500.00 cash, submitted to the court by plaintiff's petition.

The defendant bankruptcy trustee assigns that the trial court erred in awarding the impleaded cash to defendant Aldridge. Hence, the sole issue before us is whether the money should be paid to Aldridge or to Berman as trustee. Berman contends that Aldridge had no lien upon, equity in, or prior right to the disputed fund after Dugan was adjudged a bankrupt. Berman claims the fund under two theories: (1) On the date of Dugan's bankruptcy, the trustee acquired a lien on Bennett's contract debt to Dugan, and the lien attached to the $7500.00 fund which came into the escrow agent's hands. (2) The $7500.00 fund is part payment by Bennett to the credit of Dugan under their subcontract, to which is now affixed the trustee's lien.

■ In resolving the equities between the disputants, we consider them to be the same as existed between Aldridge and Dugan prior to the bankruptcy. Trustee Berman is vested with no greater right to the cash fund than Dugan had. If Aldridge's claim was good as against Dugan, it is assertable against Berman. Under the facts in this case Berman stands in the shoes of Dugan, and his title is subject to equities and defenses which were good against Dugan before bankruptcy. See 6 Am.Jur., Sec. 850. There is no evidence in the record of any fraudulent conveyance or voidable preference. It is not contended that Aldridge or Bennett had any knowledge that Dugan was in a failing condition.

■ Two factors have particularly vital bearing on the merits of this case—(1) Aldridge's rights under the mechanic's and materialmen's lien statutes, and (2) Aldridge's rights under the bond and principal contract as adopted by his contract with Dugan. It cannot be disputed that Aldridge had the right to enforce payment for his excavation work by encumbering

the owner's property with a statutory lien as provided by Chapter 429, V.A.M.S. Excavation work is a lienable item—whether done by simple hand tools or by machinery. We believe it is equally apparent that upon Dugan's failure to pay Aldridge's just and undisputed contract price, Aldridge had the right, *under his express contract with Dugan*, to sue Bennett and his surety directly upon the performance bond "subject to the owner's priority". There is no owner's priority shown or claimed in this action.

Dugan had stood in default of payment to Aldridge from and after November 20, 1958, until a date two weeks prior to the expiration of Aldridge's lien rights. Under those circumstances it does not seem that Aldridge acted in undue haste when he then went to Bennett's office and negotiated for payment of that which was due him— an undisputed debt which Bennett had bound himself to pay. It is obvious that Aldridge was able to negotiate with Bennett from a position of advantage. His claim was honest and correct. It was his legal privilege to burden the entire bank structure as lien security. It was also his unqualified right to sue directly on the bond and collect from the assets of Bennett—or from Aetna. The negotiations under those conditions produced a natural and to-be-expected result—a settlement agreement intended to satisfy Aldridge's demand and to relieve Bennett of his statutory and contractual obligations—carried into effect by Bennett's transfer of the funds now subject to the court's order. The transaction was made in contemplation of Dugan's contractual assent and legal acquiescence. It is definitive of the rights of the contesting parties in this action.

In this equity suit we look to the substance of the transaction and disregard its form. Equity goes behind the form of a transaction to give effect to the intentions of the parties concerned. It is equity's doctrine that if equitable interests in a subject matter have been created, equity will permit no injustice to result

from the form or mode of their creation. 30 C.J.S. Equity § 107, p. 516. The evidence convincingly establishes that Bennett was actuated by a legal duty in issuing the $7500.00 check to Aldridge and because of Aldridge's right to hold Bennett and his surety directly liable on the bond and to enforce a lien on the property. It is immaterial that Aldridge had not actually burdened the property with a statutory lien. Bennett was securely bound, by his contracts with Grandview and Dugan, to satisfy Aldridge's account in event of Dugan's default. It is further shown that Bennett intended the check as payment solely to Aldridge and that no portion of it was intended as payment to Dugan. It is apparent that the $7500.00 check was the price paid by Bennett to Aldridge for the release of his claim, his lien rights and his direct cause of action. Aldridge surrendered those rights in consideration of the check. In effect he sold his lien privileges and choses in action to Bennett for a consideration of $7500.00. The intended result of the transaction was to convert Aldridge's intangible choses in action into the form of cash. Since Bennett paid Aldridge a debt that was primarily Dugan's and that had become Bennett's obligation only because of Dugan's default, it is fundamental that Bennett was entitled to offset the amount so paid against any contract sum owing from Bennett to Dugan. Such offset amounts to a cancellation of Bennett's contract obligation to Dugan to the extent of $7500.00. The sum that Bennett had paid to Aldridge was no longer due and owing to Dugan. Therefore, it was not property of Dugan in any sense. Having passed beyond any legitimate claim of Dugan, legal or equitable, the $7500.00 fund could not have been subjected to any lien by creditors of Dugan. Nothing from it passed into the bankruptcy estate. Equitable ownership of the fund had vested in Aldridge. We consider the foregoing as the substance of the transaction in question. It is the function of equity to enforce the rights and duties that have sprung from the real

intention of the parties to the agreement. 30 C.J.S. Equity 107, p. 516.

■ This controversy has arisen solely because the settlement transaction was *formally* defective, in that Bennett's check unnecessarily included Dugan's name as a payee. As named in the check, Dugan was no more than a nominal party. It is apparent from the evidence that Bennett's purpose in writing Dugan's name in the check was to evidence the $7500.00 offset credit in his favor arising from his payment of Dugan's debt to Aldridge. It clearly appears that the entire proceeds of the check were intended as payment to Aldridge and that there was no intention that Dugan receive any portion of the check funds. It is explained by witness Kimberly that the construction trade observes the custom that when checks are issued by a contractor to a sub-subcontractor who is entitled to be paid or to file a lien, the intermediate subcontractor's name is also put on the check, although the payment is intended for the sub-subcontractor. Mr. Kimberly testified, " * * * it is for the protection of all concerned * * *".

Trustee Berman's brief contains an admission materially against his interest, as follows: *"Before bankruptcy*, Bennett possibly could have paid Aldridge by separate check and then offset the payment against a claim made by Dugan". The foregoing is a recognition of Aldridge's right to deal with and receive payment from Bennett. It is a concession that Bennett had a duty to pay Aldridge. It is an acknowledgment of Bennett's right to offset the payment against Dugan's contract account. In making the admission Berman concedes, in effect, that the *actual* transaction which occurred in this case would have been effective if *Dugan's name had been left off the check*. This is an extremely tenuous differentiation between a valid and an abortive transaction—considering that it is urged in an equity suit.

As a corollary proposition, it is also true that the transaction would have been effective, even as to form, if Dugan had endorsed the check. It was his duty to do so. His refusal to endorse was a wrongful act—particularly so in view of the fact that Bennett's duty to pay Aldridge arose because of Dugan's default in that obligation. Equity will not suffer Aldridge's rights to be defeated by Dugan's omission. Instead, equity will regard the check as having been endorsed by Dugan. "The maxim that equity regards that as done which ought to be done, has been said to be equity's favorite maxim." Johnson v. Brill, Mo. Sup., 295 S.W. 558. As stated in 30 C.J.S. Equity § 106, p. 510, "The broad meaning or effect of this maxim is that where an obligation rests on a person to perform an act equity will treat the person in whose favor the act should be performed as clothed with the same interest and entitled to the same rights as if the act were actually performed." Furthermore, in equity, Dugan could not have taken advantage of his own wrong to the injury and disadvantage of Bennett. Maryland Casualty Co. v. Dobbin, 232 Mo.App. 557, 108 S.W.2d 166. Berman, as Dugan's assignee and successor, is chargeable with Dugan's wrong. Berman's hands, therefore, are no cleaner in this equity proceeding than Dugan's.

Regardless of Dugan's failure to endorse the check, its endorsement has been accomplished (under the escrow agreement) and the check has been cashed. The funds are subject to award in accordance with this court's determination. By endorsing the check for payment, trustee Berman has acquiesced in receiving the payment proceeds. He elected to be a party to the acceptance of the payment and is bound by the result of this court's decision, based upon the respective rights of the parties existing at the time the check was drawn.

In contending that the $7500.00 fund was impressed with a lien in favor of the bankruptcy estate, the trustee cites and relies upon Tidewater Plumbing Supply Co. v. Schimmel, 4 Cir., 296 F. 459; Freeny v. Bauernschmidt, 4 Cir., 33 F.2d 709; and

Morley v. Carlson, 27 Mo.App. 5. Those cases involve facts so materially at variance with the facts in the instant case that they have no bearing on the issues before us.

In conclusion, we find that upon Bennett's issuance and delivery of the $7500.00 check, defendant Aldridge became the beneficial and equitable owner of the funds transferred by that instrument. It is our further finding that he should be vested with legal ownership and possession of the impleaded fund.

Accordingly, the judgment is affirmed.

All concur.